Nancy R. Simel
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: Nancy_Simel@law.state.ak.us

Attorney for Defendants Anchorage District Attorney's Office and Parkes


IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| WILLIAM G. OSBORNE,<br><br>Petitioner,<br><br>vs.<br><br>DISTRICT ATTORNEY'S OFFICE FOR THE THIRD JUDICIAL DISTRICT, ANCHORAGE, ALASKA; SUSAN A. PARKES, DISTRICT ATTORNEY, in her official capacity; ANCHORAGE POLICE DEPT., ANCHORAGE, ALASKA; WALT MONEGAN, ANCHORAGE POLICE DEPT.<br><br>Respondent. | Case No. 3:03-cv-00118-RRB<br><br><u>MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u> |

<u>Introduction</u>

Plaintiff William Osborne stands convicted by an Alaskan jury of

two counts of first-degree sexual assault, one count of kidnapping, and one count

1

of first-degree assault.  Osborne filed a civil rights complaint under 42 U.S.C. § 1983 for an injunction requiring the state defendants to provide him with access to certain items of evidence so that he can subject it to post-conviction DNA testing.  More specifically, Osborne seeks access to three items of evidence – sperm from a condom found at the scene on the night after the crimes occurred, a hair found on the outside of this condom, and a hair recovered from a sweater that the victim probably was wearing on the night that the offenses occurred.  He intends to subject these items of evidence to short tandem repeat (STR) DNA testing and possibly mitochondrial DNA testing, methods of DNA testing that were developed after his trial.

Osborne has filed a motion for summary judgment.  The state defendants oppose Osborne's request for summary judgment for the following reasons.

First, Osborne's motion and supporting memorandum are procedurally deficient because they do not include any references to the record for the facts he has asserted.  *See Kathriner v. Unisea, Inc.* 975 F.2d 657, 659 (9th Cir. 1992) (moving party bears initial burden of identifying the portions of the record it believes demonstrate the absence of any genuine issue of material fact).  Second, a number of material facts are, contrary to his assertion, in dispute.  Third, the existence of a federal constitutional right to post-conviction DNA testing is extremely dubious.  Unless and until the scope of any possible

federal constitutional right is delineated, it will be difficult, if not impossible, to

ascertain which facts are material and whether such a right would apply to

Osborne.  Fourth, as was recognized by the district court in *Moore v. Lockyer*,

2005 WL 2334350 (N.D. Cal. 2005), although Osborne is entitled to raise a claim

seeking release of the evidence in a § 1983 action, such a claim brought in this

manner must navigate a difficult course, because such a claim requires proof

that a favorable result would affect the validity of his state court convictions.  *Id.*

at *5 n.4.  This assessment is one in which the court cannot engage in a § 1983

action.  *Id.*

Factual and Procedural Background

*The Prosecution Against Osborne*

In 1994, following a joint trial in Alaska Superior Court with his co-

defendant Dexter Jackson, William Osborne was convicted of one count of

kidnapping, two counts of first-degree sexual assault, and one count of first-

degree assault. *See* AS 11.41.300; AS 11.41.310; AS 11.41.200. For these offenses

he was sentenced to an aggregate term of 26 years with 5 years suspended.  *See*

*Jackson v. State*, Mem. Op. & J. No. 3330 (Alaska App., February 7, 1996).

[Attachment A]

Osborne and Jackson were tried jointly before a jury. *Jackson*, mem.

op. at 5.  Osborne contended that he was not the person who was with Jackson,

and that, based on his whereabouts earlier and later that night, there was

3

insufficient time for him to have committed all of the offenses. *Id.* at 15. Osborne also claimed that K.G.'s identification of him was flawed. *Id.* at 16. The jury rejected Osborne's defenses and found him guilty of kidnapping, two counts of first-degree sexual assault, and first-degree assault. *Id.* at 5-6.

The Alaska Court of Appeals affirmed Osborne's (and Jackson's) convictions and sentences on direct appeal. *Jackson*, mem. op. at 18.

Osborne's (and Jackson's) convictions were based on events that occurred in Anchorage, Alaska, on March 22, 1993. That evening, Osborne and Jackson invited K.G. into Jackson's car and offered to pay her $100 to perform fellatio on both of them. *Jackson*, mem. op. at 1. They drove to a secluded area at the west end of Northern Lights Boulevard. *Id.* at 1-2, 10. During the drive, at Osborne's and Jackson's request, K.G. pulled out her Swiss army knife and handed it to the men. *Id.* at 2. They placed the knife on the car's dashboard. *Id.* At gunpoint, they forced K.G. to strip and perform fellatio on Jackson, while at the same time Osborne penetrated her vagina with his finger and penis. *Id.* at 2. While penetrating K.G., Osborne wore a blue condom that K.G. had given to him. [Tr. 406-07]

Afterwards, Jackson and Osborne assaulted K.G. by repeatedly beating her with an axe handle, hitting her on the head with the gun, choking her, kicking her, and ordering her to lie face down in the snow. *Jackson*, mem. op. at 2-3. During this assault, fearing that she would be killed, K.G. defecated

on the front passenger seat of Jackson's car. *Id.* at 2. Osborne scooped up some of the excrement and smeared it on K.G.'s face, hair, and clothing. *Id.* K.G. grabbed her clothing and fled. *Id.* The two men chased her, caught her, and again beat her. *Id.* K.G. pretended to be dead and curled into a fetal position in the snow. *Id.* at 3. While lying in the snow, K.G. heard a gun discharge, and felt a bullet graze her head. *Id.* Jackson and Osborne buried her in the snow, apparently believing that she was dead or dying. *Id.*

When K.G. was sure that Jackson and Osborne had driven away, she got up and started walking toward town. *Jackson*, mem. op. at 3. K.G. flagged down a passing vehicle, told the driver and passenger what had happened to her, and described to them her assailants and their car. *Id.* At K.G.'s request, the driver and passenger drove her home. *Id.*

The following evening, a neighbor of the passenger reported the incident to the police. *Jackson*, mem. op. at 3. When the police contacted K.G., although she was initially uncooperative, she recounted what had happened, described her assailants, and gave the police the items of clothing that she had been wearing, which were soiled with feces. *Id.* at 3-4. K.G. submitted to a physical examination. A vaginal examination was not performed, however, because Osborne had worn a condom, and because K.G. had showered repeatedly when she got home. [Tr. 238-39] When the police examined the crime scene later that night, they found in the snow, among other items, a used blue condom,

two pairs of K.G.'s bloody stretch pants, and an expended round of .380 ammunition which later was deterined to have come from Jackson's gun. *Jackson*, mem. op. at 5.

On March 28, 1993, military police stopped Jackson's car on Fort Richardson because Jackson had been flashing his headlights at another vehicle. *Jackson*, mem. op. at 4.  While Jackson was retrieving the title to his car from the glove compartment, an officer saw a gun case.  *Id.* at 4, 6-7.  The case contained Jackson's .380-caliber automatic pistol.  *Id.*  The military police found a box of ammunition for the pistol underneath the car seat.  *Id.* at 4, 7.  During a search of Jackson, the military police found K.G.'s Swiss army knife in his pocket.  *Id.*  (The knife was uniquely marked and dented so that K.G. later readily recognized it. *Id.*)

Jackson's car was the same make, model, and color as the car used by K.G.'s assailants. *Jackson*, mem. op. at 9.  The military police turned over Jackson, his passenger, the car, and the other items to the Anchorage Police Department.  *Jackson*, mem. op. at 4, 9.  When an officer from the Anchorage Police Department questioned Jackson, he stated that Osborne was the person who had accompanied him, and had participated along with him, in the attack on K.G.  [Attachment B]

K.G. was later shown photographic lineups containing pictures of Jackson, James Hunter (the man who was Jackson's passenger when his car was stopped by the military police), and Osborne. From these lineups, K.G. identified Jackson and Osborne as her assailants. *Jackson*, mem. op. at 5. K.G. also identified Jackson's car as the one where the sexual assaults had occurred. *Id.*

An axe handle later was found near the crime scene. Osborne used similar axe handles in his work, and one was found hidden behind a wall locker in his room on base. *Jackson*, mem. op. at 5.

A pubic hair taken from the blue condom and another found on the sweater K.G. was wearing on the night of the assault had the same microscopic characteristics as Osborne's pubic hair. *Jackson*, mem. op. at 5. Spermatozoa was present in the blue condom found at the scene. [Tr. 1502-04] DQ alpha DNA testing was conducted on the spermatozoa. The results showed that the spermatozoa in the condom had the same DQ alpha type as Osborne. *Jackson*, mem. op. at 5. This DQ alpha type has a frequency between 14.7 percent and 16 percent in a population of African-Americans. *Id.* The DQ apha test results were introduced at trial.

*The State Post-Conviction Relief Proceedings*

After his direct appeal was completed, Osborne filed an application for post-conviction relief in the Alaska Superior Court. *Osborne v. State*, No.

3AN-97-0636 CV.  His post-conviction relief application alleged that Osborne had not received effective assistance of counsel prior to and during trial; it sought a new trial and the release of certain items of biological evidence for supplemental DNA testing.  More specifically, on the semen from the condom found at the scene, Osborne wanted both short tandem repeat DNA testing, which is more discriminatory than the DQ alpha test that was previously conducted on the semen, and mitochondrial DNA testing, which can produce results in the absence of nuclear material.  *See, e.g., United States v. Kinkade*, 379 F.3d 813, 818-19 (9th Cir. 2004) (briefly describing short tandem repeat DNA testing); NIJ POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, p. 28 (Sept. 1999) (briefly describing mitochondrial DNA testing).  Osborne also wanted mitochondrial DNA testing done on the hair from the outside of the condom found at the scene and the hair from the sweater that the victim had been wearing.  Osborne's state post-conviction relief application was denied.

Osborne appealed the denial of post-conviction relief to the Alaska Court of Appeals, Alaska's intermediate appellate court.  *Osborne v. State*, Court of Appeals File No. A-8399.  The court of appeals affirmed the superior court's ruling that Osborne had not received ineffective assistance from his trial counsel.  *Osborne v. State*, 110 P.3d 986, 987, 991-92 (Alaska App. 2005).  The court of appeals concluded that trial counsel's affidavit established that she had researched and considered the possibility of having more conclusive DNA tests

8

performed on the evidence, but made a reasonable tactical decision not to seek further testing because it had a substantial chance of incriminating Osborne and because the less conclusive test that had been conducted by the state allowed her to argue that a substantial portion of the African-American population had the same genetic profile as the sperm found in the condom. *Id.* at 991-92.

The Alaska Court of Appeals, however, reversed the trial court's ruling with respect to Osborne's request for post-conviction DNA testing and remanded the case for further proceedings. *Id.* at 987, 992-95. The court of appeals concluded that although Osborne did not have a federal due process right to post-conviction DNA testing, he did have a limited due process right to the testing under the state constitution. *Id.* at 992-95. To qualify for this right, a prisoner must at a minimum show that (1) the conviction rested primarily on eyewitness identification, (2) there was a demonstrable doubt concerning the defendant's identification as the perpetrator, and (3) scientific testing would likely be conclusive on this issue. *Id.* at 995. In addition, a prisoner may also have to show that the evidence, in this case STR and mitochondrial DNA testing, was newly discovered, that the prisoner exercised due diligence in presenting his or her claim, and that the new evidence would establish his or her factual innocence. *Id.* The Alaska Court of Appeals retained jurisdiction over the case, and will resume consideration of Osborne's state due process claim once the remand proceedings are complete. *Id.*

Standard For Granting Summary Judgment

Summary judgment will be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). Summary judgment will be granted only when, after discovery, a party has made a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Cattrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In order to carry its burden of production, when, as here, the moving party bears the ultimate burden of persuasion at trial, the moving party must produce evidence on each element of its claims that would entitle it to a directed verdict if not controverted at trial. 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2727, p. 121 (2d ed. 1983). In all cases, the moving party bears the initial burden of identifying the portions of the record that it believes demonstrate the absence of any genuine issue of material fact. *Kathriner v. Unisea, Inc.*, 975 F.2d 657, 659 (9th Cir. 1992). If the moving party satisfies its initial burden, the responding party must set forth, by affidavit or other means, "specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation omitted). But, if a moving party fails to carry its initial burden of production, the nonmoving party is under no obligation to provide anything, even when the nonmoving party would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Insurance Company, Ltd.*

*v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103.

A fact is material when a dispute as to its existence might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The governing substantive law determines which facts are material. *Id.*, 106 S.Ct. at 2510. Materiality, thus, identifies which facts are critical in relation to the legal elements of the claims. *Id.*, 106 S.Ct. at 2510. A genuine dispute with respect to a material fact exists when the record contains sufficient evidence to allow a reasonable juror or judge to return a verdict in favor of the nonmoving party. *Id.* at 248-49, 106 S.Ct. at 2510. If reasonable minds could differ as to the import of the evidence, summary judgment should not be granted. *Id.* at 250-51, 106 S.Ct. 2511.

Discussion

### *Osborne Has Not Met His Initial Burden Of Production*

Osborne has not identified which portions of the record support his factual claims. This omission is fatal to Osborne's motion for summary judgment. *See Kathriner*, 975 F.2d at 659.

### *Genuine Issues Of Material Facts Exist*

Because the existence, source, and scope of any federal constitutional right to post-conviction DNA testing of evidence used to convict a state prisoner

remains an open question in this circuit (which will be discussed below), it is difficult to ascertain all of the facts that will be material in the current controversy. If, as argued below, a federal constitutional right to post-conviction DNA testing does not exist, then none of the facts are material and obviously there are no material facts in dispute. Assuming solely for the purposes of argument that some type of federal constitutional right to post-conviction DNA testing exists, however, it is apparent that at least some of the facts that are likely to be material are genuinely in dispute. If it is determined that such a right exists, once the nature and scope of the right are determined, then additional material facts may well be in dispute. In the meantime, it appears that the following factual matters are material and are genuinely in dispute:

1.     It has never been established that the condom found in the snow near the scene was the condom that was used by K.G.'s assailant. The condom was found approximately 24 hours after the assault. *Osborne*, 110 P.3d at 989. Under this circumstance, it cannot be established that the condom (containing the sperm Osborne wishes to have tested and on the ouside of which is a hair Osborne wishes to have tested) is the condom used by K.G.'s assailant.

2.     It has never been established that the hair found on the sweater that K.G. gave to the police was from one of her assailants. Given that K.G. was working as a prostitute, given the great propensity that hairs have for transfer, and given the texture of the sweater and its ability to hold a hair, Osborne

cannot establish that the hair recovered from K.G.'s sweater was from her assailant.

3.     Jackson has more than "suggested" that Osborne was with him on the night of the offense.  [Memo. Summ. Jgt. 6]  Jackson has repeatedly maintained, as recently as 2004 in statements to the Alaska Board of Parole, that Osborne was the other assailant.  [Attachment C]  In fact, Osborne has on at least two occasions admitted that he was one of K.G.'s two assailants. [Attachments D, E]  In addition, Osborne was observed entering Jackson's car on the night of the offense.  [Tr. 1219, 1222-25]

4.     Because of the circumstances surrounding the Anchorage Police Department's discovery of the condom in the snow at Point Woronzof and because of the circumstances surrounding K.G.'s use of her sweater, DNA test results excluding Osborne as the source of either the semen from the condom found at the scene, the hair found on the outside of the condom, or the hair found on K.G.'s sweater would not establish Osborne's factual innocence.  The fact that the trial prosecutor mentioned these items of evidence in closing argument is not relevant to whether favorable DNA test results would prove Osborne's factual innocence.   Factual innocence does not mean that there is a reasonable probability or even possibility that a fact-finder would have reached a different result if it had received the new evidence; it means that the new evidence would have established that the defendant did not commit the crimes.

*Osborne Does Not Have A Federal Constitutional Right To Post-conviction DNA Testing*

A claim under § 1983 will lie only where a "specific constitutional guarantee is violated or the error is of such magnitude that the result denies a fundamentally fair trial" under the federal due process guarantees. *See Fuller v. Roe*, 182 F.3d 699, 703 (9th Cir. 1999). Because Osborne cannot identify with any specificity which constitutional provision was allegedly violated by the state defendants [Memo. Summ. 10-11], and the Alaska Court of Appeals has expressly found that Osborne's trial was not fundamentally unfair, *see Osborne*, 110 P.3d at 993-96, Osborne cannot establish the type of constitutional violation necessary to support a claim under § 1983. Moreover, none of the constitutional provisions that supposedly provide the "doctrinal roots" of the right when examined are sufficient to support the creation of such a right out of whole cloth.

Contrary to Osborne's assertion, this circuit has not explicitly recognized an unfettered due process right to access to post-conviction DNA testing. [Memo. Summ. Jgt. 9, 13-14] In fact, this circuit in Osborne's case expressly declined to reach the issue in the first instance. *Osborne v. District Attorney's Office*, 423 F.3d 1050, 1056 (9th Cir. 2005).

Osborne relies on *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992), but that reliance is misplaced. *Thomas*, unlike the present case, involved a federal habeas claim from a state prisoner that, prior to trial, the prosecutor had suppressed a semen sample and that defense counsel had

been ineffective for not seeking production of the semen sample. 979 F.2d at 747-49. Because the prisoner's habeas claims had been procedurally defaulted, the prisoner had to make a colorable showing of factual innocence in order to meet the miscarriage-of-justice exception to the cause and prejudice requirement, and he needed access to the semen samples in order to have any chance to make this showing. *Id.* at 749. The court found that because the sample was under control of the state, the prisoner had no means to get the sample tested and make the showing unless the federal courts intervened. *Id.* In order to avoid defeating the claim by what the court characterized as a "conundrum," it held that under these circumstances, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), provided a basis to charge the state with an ongoing obligation to turn over potentially exculpatory evidence relevant to the prisoner's ongoing federal habeas action. *Id.* at 749-50.

Osborne, unlike the prisoner in *Thomas*, does not have an ongoing federal habeas action for which the evidence would be relevant. Nor has Osborne claimed that the evidence is necessary to satisfy any particular showing he must make in any court. In short, the evidence is not relevant to any ongoing proceeding. Moreover, Osborne is not in the "conundrum" in which the prisoner in *Thomas* found himself. Osborne does have, and is pursuing, a means to have the samples at issue tested without the intervention of the federal courts – he is currently litigating the matter in the state courts. Under these circumstances,

15

the very limited procedural due process right recognized in *Thomas* is inapplicable to Osborne.

In fact, it appears at best a dubious proposition that *Brady* extends the prosecution's pretrial obligation to turn over exculpatory evidence into an obligation that extends in perpetuity.  Marginal support for this extension of *Brady* can be found in an isolated statement appearing in *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987), that "the duty to disclose [exculpatory evidence] is ongoing."  But when this statement is read in context, it is apparent that the Court did not intend *Brady* to be applied to the post-conviction disclosure of exculpatory information.  The court went on in the same sentence to say that "information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the *trial*.  *Id.*, 480 U.S. at 60, 107 S.Ct. at 1003 (emphasis added).  This language shows that the Court was explaining that the state has an ongoing obligation to turn over exculpatory information throughout the pretrial period.  The Court has on other occasions said that the right afforded in *Brady* is solely a trial right.  *See United States v. Ruiz*, 536 U.S. 622, 628-32, 122 S.Ct. 2450, 2454-55, 153 L.Ed.2d 586 (2002) (right to receive from prosecutors exculpatory impeachment material is part of the constitutional guarantee of a fair trial and does not apply to a defendant's decision to enter a no contest plea); *United States*

*v. Bagley*, 473 U.S. 667, 675-76, 105 S.Ct. 2275, 87 L.Ed.2d 481 (1985) (*Brady* rule was intended to further the right to a fair trial; prosecutor required to turn over only information that, if not disclosed, would deprive defendant of a fair trial).   The Court's statements in no way establish or even suggest that the *Brady* rule extends indefinitely.

In *Harvey v. Horan*, 278 F.3d 370, 374-76, 378-79, *reh'g denied*, 285 F.3d 298 (4th Cir. 2002), the court expressly rejected the district court's conclusion that Harvey had a due process right of access to DNA evidence under *Brady*.  The court concluded that "finality cannot be sacrificed to every change in technology," and that "[t]he possibility of post-conviction developments, whether in law or science, is simply too great to justify judicially sanctioned constitutional attacks upon final criminal judgments."  *Id.* at 376.  The court went on to say that if criminal offenders should be allowed to avail themselves of advances in technology to attack their convictions, "it should be accomplished by legislative action rather than by a federal court as a matter of constitutional right."  *Id.*

Chief Judge Wilkinson, concurring in the denial of rehearing, points out the difficulties both in identifying the nature, scope, and contours of any potential federal due process right to access to the evidence and in the lack of wisdom in bestowing such a constitutional right, rather than relying on the legislative process to address the question.  *Harvey*, 285 F.3d at 301-03.  The

*Horan* majority's opinion is not stripped of its persuasive force because another judge – Judge Luttig – in concurring in the denial of rehearing, expressed the opinion that this portion of the majority opinion of the panel decision was incorrect. *See Harvey*, 285 F.3d at 304-26 (Luttig, J., concurring). In fact, Judge Luttig subsequently has recognized that opinions commenting on the denial of rehearing should not be viewed as modifying or revising the court's original opinion in a case, and that the original opinion remains the binding law of the circuit. *See Jones v. Buchanan*, 325 F.3d 520, 538 (4th Cir. 2003) (Luttig, J., dissenting).

In *Moore v. Lockyer*, 2005 WL 2334350 (N.D. Cal., Sept. 23, 2005), the district court also considered whether a defendant has a federal constitutional due process right to post-conviction DNA testing. The court first acknowledged that the existence of such a right is a question of first impression in this circuit and that the question has not yet been expressly decided by any federal court of appeals. *Id.* at *7. The court commented that "the Constitution must impose *some* limitations upon a state's authority to withhold potentially exculpatory evidence from a convicted criminal defendant seeking to prove his or her innocence," and reasoned that "it must be the case that due process will under certain circumstances require a state to provide a lawfully convicted criminal with access to potentially exculpatory biological evidence." *Id.* at *8. The court recognized, however, that "there may be good reasons to distinguish

18

the scope of a defendant's post-conviction right to access potentially exculpatory evidence from the pretrial right that was at issue in *Brady* and *Bagley*." *Id.* The court also recognized that the right to access such potentially exculpatory evidence would not be an unconditional right, that a lawfully sentenced defendant has at most only a very limited residual due process right, and that that limited residual right must be weighed against the state's interest in preserving the finality of its criminal judgments. *Id.* at *9.

The court then concluded that it was not necessary to answer the difficult question of where the contours of such a right would lie, but noted that, in light of the state's interest in finality, its very outer limits would require the defendant to at a minimum prove a "reasonable probability" that disclosure of that evidence would affect the outcome of the trial – the standard used when assessing a similar claim in the pretrial context. *Moore*, 2005 WL 2334350 at *9. Because Moore could not prevail even at the outer limits of such a right in the pretrial context, the court did not address where the contours of such a right might lie in the narrower arena of the post-conviction world. *Id.* at *9-10.

*Moore* thus does not support Osborne's claim that any defendant convicted of a sexual assault has an unfettered constitutional right to access to biological evidence in order to subject it to DNA testing. At most it provides support for the proposition that an extremely limited due process right to post-conviction DNA testing might exist in circumstances that the court has not yet

identified.  Moreover, to the extent that *Moore* supports the proposition that a limited due process right to post-conviction DNA testing exists, it is not binding on this court and its conclusion is ill-advised.

The establishment of an unfettered procedural due process right under *Brady* to test or retest evidence with each forward step in forensic science would leave perfectly valid judgments in a perpetually unsettled state.  A defendant is always convicted based on science that is less than perfect and science is continually advancing.  The important value finality accords to our system of justice weighs heavily against the establishment of an unrestricted right to retest evidence using the most recent scientific developments in the hope that the latest test might somehow undermine the evidence of guilt or help to prove the defendant's innocence.  In *Teague v. Lane*, 489 U.S. 288, 309, 109 S.Ct. 1060, 1074, 103 L.Ed.2d 334 (1989), the Supreme Court stressed that finality "is essential to the operation of our criminal justice system."  The Court explained that "[w]ithout finality, the criminal law is deprived of much of its deterrent effect."  489 U.S. at 309, 109 S.Ct. at 1974.  *See also McCleskey v. Zant*, 499 U.S. 467, 491-92, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991) (quoting *Teague*).

Osborne was given the opportunity to subject the evidence to DNA testing before trial using the best technology available at that time. He accordingly does not have a valid *Brady* claim. Evidence discovered after trial, or whose exculpatory potential is discovered after trial, obviously was not suppressed and cannot be said to have affected his right to a fair trial.

Osborne also does not have a substantive due process right under the federal constitution to conduct post-conviction DNA testing. As Osborne candidly admits, the purpose of such testing would be to attempt to prove his supposed innocence of the crimes for which he was convicted. [Memo. Summ. 15] But a defendant does not have a federal due process right to present new evidence, even when that evidence would demonstrate factual innocence.

In *Herrera v. Collins*, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993), the United States Supreme Court ruled that a state may constitutionally enforce a statutory time limitation on motions for a new trial based on newly discovered evidence, even if a defendant has no other means to bring a claim of actual innocence. The Court expressly stated that a claim of actual innocence based on the existence of newly discovered evidence is not a ground for federal habeas relief absent an independent constitutional violation in the underlying state criminal proceeding. *Id.* at 400, 113 S.Ct. at 860 ("federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact"). Moreover, Justice

Scalia and Justice Thomas opined that "[t]here is no basis in text, tradition, or even in contemporary practice . . . for finding in the Constitution a right to demand judicial consideration of newly discovered evidence of innocence brought forward after conviction." *Id.* at 427-28, 113 S.Ct. at 874 (Scalia, J., joined by Thomas, J., concurring).

The Court further explained that although a claim of actual innocence is not itself a constitutional claim, it may be a "gateway" through which a habeas petitioner, who seeks excusal of a procedural error, would have to pass to have his otherwise barred independent constitutional claim heard on the merits. *Id.* at 404, 113 S.Ct. at 862. The Court however assumed, without deciding, that "in a capital case a truly persuasive deomnstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional." *Id.* at 417, 113 S.Ct. at 853. The threshold showing for such an assumed right would necessarily be "extraordinarily high" and would require the defendant at the least to "affirmatively prove that he is probably innocent." *Id.* at 417, 113 S.Ct. at 853. Thus, under *Herrera*, it is far from clear that Osborne has a free-standing federal right to prove his supposed actual innocence. Accordingly, Osborne's claim that he needs access to the evidence in order to prove his supposed actual innocence is not a claim that can be recognized as a matter of federal due process in the absence of an independent constituional claim of error.

Despite the Supreme Court's decision in *Herrera*, Osborne claims that "[f]reestanding innocence claims are clearly cognizable in the Ninth Circuit." [Memo. Summ. 17]  In support of this contention, Osborne relies on *Carriger v. Stewart*, 132 F.2d 463, 476 (9th Cir. 1997).  But Osborne places too great a reliance on *Carriger*.  Although in *Carriger* the court was of the opinion that the majority of the justices in *Herrera* would have supported a freestanding claim of actual innocence to prevent the execution of a defendant, the court recognized that such a claim would require a "truly persuasive" showing, that the threshold for such a showing would be "extraordinarily high," and that it would require more than deomonstrating doubt about the outcome at trial – it would at the least require affirmative proof that the defendant probably is innocent.  *Id.*  Moreover, both *Herrera* and *Carriger* were death penalty cases.  Although the Court in *Herrera* said that it had never required the use of a different standard of review in a death penalty case, the Court's assumption of a right to demonstrate actual innocence was tied to the prospect of executing a truly innocent prisoner.  *Herrera*, 506 U.S. at 405, 417, 113 S.Ct. at 863, 869.  Since Osborne is not subject to the death penalty, the assumption of the limited right to demonstrate actual innocence would not apply to Osborne.

### *Any Due Process Right That Osborne Might Have To Conduct Post-conviction DNA Testing Was Not Violated*

For the reasons discussed in the preceding sections, any possible federal due process right that might   exist to post-conviction DNA testing

would be contingent upon a convicted offender demonstrating that the new evidence could prove his factual innocence.   Osborne cannot satisfy this condition.  The condom and associated hair were found in the snow more than 24 hours after the offense.  The hair on the victim's sweater had other potential sources.  Jackson has implicated Osborne in the offense and Osborne himself has repeatedly confessed to participating in the offense.  In addition, Osborne was seen before and after the offense in the presence of Jackson.   Finally, the substantial remaining circumstantial evidence confirms that Osborne was guilty as convicted.

### Defendants Have Not "Thwarted" Osborne's Right Of Access To The Courts

Osborne also asserts that the state defendants have prevented him from meaningful access to the courts, specifically to the federal court to bring a habeas action asserting actual innocence.  [Memo. Summ. 16]  Osborne is mistaken.

In *Christopher v. Harbury*, 536 U.S. 403, 412-18, 122 S.Ct. 2179, 2185-88, 153 L.Ed.2d 413 (2002), the United States Supreme Court discussed the types of meaningful access claims and their elements.  The Court categorized access claims into two categories.  The first category comprises claims involving systemic official action that frustrates a party in preparing or filing a lawsuit at that time, such as claims involving prison law libraries or filing fees that poor plaintiffs cannot afford to pay.  *Id.* at   413, 122 S.Ct. at 2185-86.  The Court

explained that "the essence" of this type of access claim "is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs," even though the opportunity to litigate has not been lost for all time. *Id.* at 413, 122 S.Ct. at 2186. The second category comprises claims involving official action that preclude a claim from being litigated at the present time or in the future regardless of what official action is taken in the future. *Id.* at 413-14, 122 S.Ct. at 2186. The Court explained that this type of access claim looks "backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* at 414, 122 S.Ct. at 2186 (footnotes omitted). Both types of access claims are intended "to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15, 122 S.Ct. at 2186.

Osborne's access claim plainly fits within the first category as he is claiming only that he is being denied the opportunity to gather evidence to support a future lawsuit. Osborne's claim fails for two reasons. First, it is not any official action that is currently preventing Osborne from filing a habeas action in the federal courts. Instead, it is the statutory requirement that he first exhaust his state remedies. *See* 28 U.S.C. § 2254(b). Since Osborne is currently litigating in state court both his right to access to the evidence and his supposed actual innocence, the pendency of that litigation, not official action, is what is currently preventing Osborne from filing a federal habeas action. Second, since

Osborne is currently litigating these very matters in state court, it is apparent that official action has not prevented him from filing a lawsuit in state court.

*Osborne Does Not Have A Federal Constitutional Right To Executive Clemency*

Osborne complains that his lack of access to the evidence has thwarted his ability to effectively pursue executive clemency. [Memo. Summ. 17] But the federal constitution does not afford a state prisoner the right to pursue executive clemency. Although in *Herrera*, the Court recognized that "[c]lemency is deeply rooted in our Anglo-American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted," the Court also said that the Constitution "does not require the States to enact a clemency mechanism." 506 U.S. at 411-12, 414, 113 S.Ct. at 866, 867. Because Osborne has no federal constitutional right to pursue executive clemency, his claim is not a basis for relief here.

Conclusion

Osborne does not have a constitutional right to DNA testing in this case. This court should deny Osborne's motion for summary judgment.

DATED February 17, 2006 , at Anchorage, Alaska.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL

s/ Nancy R. Simel
    Assistant Attorney General
    State of Alaska, Dept. of Law
    Office of Special Prosecutions
        and Appeals
    310 K St., Suite 308
    Anchorage, Alaska 99501
    Telephone: (907) 269-6250
    Facsimile: (907) 269-6270
    e-mail: Nancy_Simel@law.state.ak.us
    Alaska Bar. No. 8506080

**Certificate of Service**

I certify that on February 17, 2006, a copy of the foregoing Memorandum in Opposition to Motion for Summary Judgment was served electronically on **Randall S. Cavanaugh, Mary B. Pinkel, Robert C. Bundy** and on **David Menschel, Peter J. Neufeld and Colin Starger at Cardozo School of Law 55 5th Avenue, 11th Floor New York, NY 10003** by regular U.S. mail.

**s/ Nancy R. Simel**