THE COURT OF APPEALS OF THE STATE OF ALASKA

DEXTER C. JACKSON,                )
                                  )     Court of Appeals No. A-5276
          Appellant,              )     Trial Court No. 3AN-S93-2338CR
                                  )
     v.                           )
                                  )     MEMORANDUM OPINION
STATE OF ALASKA,                  )
                                  )     AND JUDGMENT*
          Appellee.               )
                                  )
――――――――――――――――――――――――――――――――)
                                  )
WILLIAM G. OSBORNE,               )
                                  )     Court of Appeals No. A-5329
          Appellant,              )     Trial Court No. 3AN-S93-2339CR
                                  )
     v.                           )
                                  )
STATE OF ALASKA,                  )
                                  )
          Appellant.              )     [No. 3330 – February 7, 1996]
                                  )
――――――――――――――――――――――――――――――――)

          Appeal from the Superior Court, Third Judicial
          District, Anchorage, Milton M. Souter, Judge.

          Appearances:  Rex Lamont Butler,  Rex Lamont
          Butler   and   Associates,   Anchorage,   for
          Appellant,  Dexter  C.  Jackson.   Sidney  K.
          Billingslea, Anchorage, for Appellant, William
          G. Osborne. W.H. Hawley, Assistant Attorney
          General, Office of Special Prosecutions and
          Appeals, Anchorage, and Bruce M. Botelho,
          Attorney General, Juneau, for Appellee.

          Before:   Bryner,  Chief  Judge,  Coats  and
          Mannheimer, Judges.

          COATS, Judge.

          On March 22, 1993, Dexter C. Jackson and William G.
Osborne invited K.G. into Jackson's car with the promise that they
would pay her $100 for oral sex.  The two took K.G. to a secluded
spot at the west end of Northern Lights Boulevard, ignoring her

――――――――――――――――――――――――――――――――――――――――――――――――――――――――――――

     *  Entered pursuant to Appellate Rule 214 and Guidelines for
Publication of Court of Appeals Decisions (Court of Appeals Order
No. 3).

request that they park along Spenard Road. During the ride along Northern Lights Boulevard, Jackson and Osborne asked K.G. if she was armed, and when she told them that she had a Swiss army knife, they asked if they could look at the knife. They took the knife and placed it on the car's dashboard when she surrendered it.

When the three stopped at the end of the boulevard, the men asked K.G. to perform fellatio on each of them with the understanding that she would be paid afterward. When K.G. told Osborne and Jackson that she would not perform without having first been paid, Osborne pointed a gun at her and told her, "I think you will."

Jackson and Osborne took what little money K.G. had, made K.G. strip, and then had sex with her. K.G. performed oral sex on Jackson while Osborne penetrated K.G. vaginally with his finger and his penis. Afterward, Osborne ordered K.G. to "get out of the car, bitch, and lay down in the snow, face down."

When K.G. stayed in the car and began pleading for her life, Jackson hit K.G. in the head with the gun and Osborne choked her after being urged to do so by Jackson. Fearing that she would die, K.G. defecated on the front passenger seat of Jackson's car. Osborne scooped up some of the excrement and rubbed it in K.G.'s face, hair, and clothing. When she was able to do so, K.G. grabbed some of her clothes and fled a short distance from the car where she began to dress.

The two men took a piece of wood, probably an axe handle, from the back of the car and began to strike K.G. in the back of her head and in her ribs. When K.G. tried to run, Osborne battered

-2-

3330

her knees repeatedly, telling her, "go down, bitch, go down." Jackson and Osborne hit and kicked K.G. until she fell down. Jackson continued to pound K.G. in the area of her pubic bone with the stick even after she had fallen. At one point, Osborne allowed K.G. to stand up, but then hit her in the head with the axe handle.

K.G. decided to pretend that she was dead, and curled into a fetal position in the snow. At trial, K.G. recounted how she had heard the gun discharge and felt the bullet graze her head. K.G. believed, based on glimpses of her assailants' feet and of Osborne's sweatsuit, that it was Osborne who had shot her. The state produced expert testimony at trial showing that one of K.G.'s head injuries was a "shallow gouge" injury consistent with a close scrape with a bullet. Jackson and Osborne then buried K.G. in the snow, believing that she was either dead or dying.

K.G. heard Jackson's car drive away. She continued to lie under the snow for some time to make sure that her attackers had left the area, then got up. After walking toward town for a short while, K.G. was able to flag down a passing automobile. K.G. told the car's driver and passenger what had happened to her; she also described the men who had attacked her and the car that they had driven. K.G. asked to be taken home because she wished to avoid the police. The driver and passenger of the car complied with her request.

The next day, the incident was reported to the police by a neighbor of one of the occupants of the car that had taken K.G. home. When she was contacted by the police, K.G. was initially uncooperative, but was persuaded to describe what had happened to

3330

her and to turn over the clothes that she had been wearing. The clothes were soiled with feces. A presumptive test indicated that semen was present on one piece of clothing, but no semen was recovered. K.G. also underwent a physical examination and most of her injuries were photographed.

On March 28, 1993, at about 12:30 a.m., military police stopped Jackson's car on Fort Richardson. The military police were aware that the Anchorage Police Department had circulated composite drawings of a car and two black males, and further noted that Jackson, his passenger (who was not Osborne), and the car resembled the drawings. The police testified at trial that they had initially stopped Jackson because he had been flashing his headlights at a pickup driving in front of him. When Jackson opened his glove compartment in order to retrieve title to his car, an officer saw a gun case. The case contained Jackson's .380 caliber automatic pistol.

When the military police searched the car, they found a box of ammunition for the gun under the passenger seat. During a search of Jackson, the military police found K.G.'s Swiss army knife in his pocket. (The knife was uniquely marked and dented and K.G. was able to readily identify it.) The police arrested Jackson and the passenger and took them to the Military Police station.

The military police turned over the car and items seized to the Anchorage Police Department (APD). Anchorage police officers found additional ammunition in a subsequent search of the car. The municipal police also detected blood in the car; a D.Q. alpha sample from the passenger door matched K.G.'s D.Q. alpha

-4-

3330

type, which occurs in between 4.4% and 4.8% of white females. Fibers matching the carpeting were found on one of the sweaters K.G. had been wearing that night.   K.G. later identified both Jackson and Osborne in photographic lineups.  She also identified Jackson's car.

An investigation of the scene of the assault, conducted on the evening of March 23, revealed an area of disturbed and bloody snow.  The police also discovered two pairs of K.G.'s bloody gray stretch pants, a used blue condom, and an expended round of .380 ammunition which was later determined to have come from Jackson's gun.  Tire tracks on the scene matched those made by Jackson's car.

A pubic hair taken from the blue condom and another found on the sweater K.G. had worn on the night of the assault had the same characteristics as Osborne's pubic hair.  Another Negroid hair found on K.G.'s sweater did not match any of the suspects investigated by police.  Sperm in the condom matched Osborne's D.Q. Alpha type, which is shared by between 14.7% and 16% of the African-American population.

An axe handle was later found 114 feet from the crime scene.  Osborne used similar axe handles in his work and one was found when his room was searched.  Jackson was also known to keep a similar kind of stick in the back seat of his car.

Jackson and Osborne were tried jointly before a jury. Superior Court Judge Milton M. Souter presided over the trial. Jackson was convicted of kidnapping, first-degree sexual assault, first-degree assault, and third-degree assault.  Osborne was

3330

convicted of kidnapping, first-degree assault, and two counts of first-degree sexual assault.[1]  Judge Souter sentenced Jackson to a composite sentence of twenty-seven years with five years suspended. He sentenced Osborne to twenty-six years with five years suspended. The defendants appeal their convictions and sentences to this court.  We affirm.

Jackson contends that Judge Souter erred in refusing to suppress evidence which the military police found when they searched Jackson's car.  Jackson contends that the military police did not have legal grounds to stop his car.  He also contends that the actions of the military police violated the Posse Comitatus Act.

The military police officers who stopped Jackson testified that they stopped him during the early morning hours of March 28, 1993.[2]  The officers testified that they observed Jackson flash his headlights several times at a car in front of him.  As a result of seeing this activity, they made a traffic stop of Jackson.  After pulling Jackson's car over, the military police approached the car.  One MP was on each side of the car.  They asked Jackson for his license and registration.  When Jackson

---

[1]  Jackson was acquitted of attempted first-degree murder, solicitation to commit first-degree murder, and one count of sexual assault in the first degree.  Osborne was acquitted of two counts of attempted first-degree murder and one count of sexual assault.

[2]  In reviewing Judge Souter's ruling on the suppression motion we have considered the testimony presented at grand jury and at trial.  We have previously ruled that we will consider evidence presented at trial to support the trial court's ruling on a suppression issue even though this evidence was not available to the trial court at the time the court ruled on the suppression issue prior to trial.  Hubert v. State, 638 P.2d 677, 680 n.2 (Alaska App. 1981).

opened his glove compartment to get his registration, the military police officer on the passenger side of the car saw a black gun case. He alerted his partner that there was a gun in the car, and the military police ordered Jackson and his passenger out of the car. At this point, the military police searched Jackson and the passenger for weapons. They also searched the car for weapons and ammunition.

The military police could validly stop Jackson's car to enforce traffic regulations. Resecker v. State, 721 P.2d 650, 652 (Alaska App. 1986). The state points out that when Jackson flashed his high beams at the car in front of him he violated the Alaska Traffic Code, which the military police were authorized to enforce on Fort Richardson. Alternatively, the police could have stopped Jackson since the repeated flashing of his high beams may have indicated that his headlights were defective. See Russell v. Municipality of Anchorage, 706 P.2d 687, 689 (Alaska App. 1985) (misty rear view mirror justified stop to permit driver to clear window); State v. Fuller, 556 A.2d 224 (Me. 1989) (when car approaching officer blinked headlights four or five times in quarter mile, officer could stop vehicle because headlights might have been defective).[3] We therefore conclude that Judge Souter did

---

[3] Jackson contends that the state cannot argue for the first time on appeal that the stop was justified because of a moving violation, i.e., the flashing of bright headlights within 300 feet of another vehicle. However, we may affirm a trial court ruling for reasons other than those argued below. See McGee v. State, 614 P.2d 800, 805 n.10 (Alaska 1980), cert. denied, 450 U.S. 967 (1981). The state did raise the argument that the flashing bright headlights may have signified a potentially dangerous malfunction. Jackson contends that there was no evidence that he was within 300 feet of the vehicle in front of him. However, it is a reasonable
(continued...)

-7-

not err in finding that the military police legally stopped Jackson's car.

We also conclude that Judge Souter did not err in finding that the military police did not violate the Posse Comitatus Act. In McNeil v. State, 787 P.2d 1036, 1037 (Alaska App. 1990), we stated: "It is well settled . . . that the Posse Comitatus Act is not violated when military officers pursue a legitimate and independent military purpose."  In McNeil, a military police officer on duty at Fort Richardson Military Reservation stopped McNeil when he saw him driving in an erratic manner because he suspected McNeil was intoxicated.  After speaking to McNeil, the MP decided that McNeil was not intoxicated.  However, when he learned from a computer check that McNeil's driver's license was suspended, the MP contacted the Alaska State Troopers, who arrested McNeil for driving while his license was suspended.  Id.  We found no violation of the Posse Comitatus Act and concluded that the MP "stopped McNeil in order to protect motorists travelling on military property from the danger of intoxicated drivers."  Id.  We concluded that the MP "acted with [a] legitimate military purpose." Id.  The present case appears to us to be similar to McNeil.  The military police legitimately stopped Jackson for a traffic violation and/or to determine if his headlights were defective. When they asked Jackson for his license and registration, they saw that he had a concealed pistol in his glove compartment.  In order

---

³ (...continued)
inference from the officer's testimony that Jackson was flashing his lights at a car ahead of him and that the car ahead of him was within 300 feet.

to protect themselves, the military police had Jackson and his passenger get out of the car, searched them for weapons, and searched the car for weapons. When the police realized that Jackson's car matched the description in an Anchorage Police Department bulletin, they turned Jackson, the car, and evidence they found in the weapons check over to the Anchorage Police Department. Judge Souter could properly find that the military police were pursuing a "legitimate and independent military purpose" in stopping Jackson and searching him. Turning Jackson over to the Anchorage Police did not violate the Posse Comitatus Act because the military police acted on their own initiative. Id. Accordingly, Judge Souter did not err in determining that there was no violation of the Posse Comitatus Act.

Jackson next contends that Judge Souter erred in denying his motion to dismiss the indictment. Jackson first argues that the state presented evidence to the grand jury which was the product of an illegal search and seizure. Previously in this decision we have concluded that this evidence was not illegally seized. We accordingly conclude that Judge Souter did not err in refusing to dismiss the indictment on this theory.

Jackson contends that the state presented insufficient evidence to the grand jury to show that he committed a kidnapping. He contends that his restraint of K.G. was so closely related to the sexual assault in time and place that there was insufficient evidence of restraint to constitute a kidnapping. Alam v. State, 793 P.2d 1081, 1083-84 (Alaska App. 1990); Alam v. State, 776 P.2d 345, 347-50 (Alaska App. 1989).

The elements of kidnapping are set forth in AS 11.41.300-(a)(1)(c): "A person commits the crime of kidnapping if . . . the person restrains another with intent to . . . inflict physical injury upon or sexually assault the restrained person." The definition of "restrain" is set forth in another part of Chapter 41:

> "restrain" means to restrict a person's movements unlawfully and without consent, so as to interfere substantially with the person's liberty by moving the person from one place to another or by confining the person either in the place where the restriction commences or in a place to which the person has been moved; a restraint is without consent if it is accomplished . . . by force, threat, or deception.

AS 11.41.370(3)(A).

The evidence which the state presented to the grand jury supported the theory that Jackson and Osborne committed kidnapping by restraining K.G. through the use of deception. AS 11.41.-370(3)(B). Based upon the evidence presented to the grand jury, the grand jury could reasonably conclude that Jackson and Osborne intended to sexually assault K.G. when they contacted her. They lured her into the car by promising to pay her for sex. They then drove her to an isolated area where they could carry out their sexual assault on K.G. in a place where they would not be disturbed and she would be unable to get help or escape.

Jackson contends that there was insufficient evidence before the grand jury to charge him with sexual assault. He points out that K.G. was willing to perform sexual acts for money. However, the evidence presented to the grand jury shows that Jackson and Osborne forced K.G. to perform the sexual acts at gun

-10-                                                              3330

point.  See AS 11.41.470(8)(A).  The evidence presented to the grand jury supported the inference that K.G. performed the sexual acts without consent.

Jackson cursorily argues that Judge Souter erred in denying a mistrial motion which he made at the conclusion of the prosecutor's opening statement.  We conclude that this argument is not adequately briefed, and is therefore waived.  Kristich v. State, 550 P.2d 796, 804 (Alaska 1976).

Jackson next contends that Judge Souter erred when instructing the jury on kidnapping.  The instruction provided, "A person commits the crime of kidnapping if the person restrains another person with intent to inflict physical injury or sexually assault the person . . . ."  The instructions defined "restraint" as meaning "to restrict a person's movements unlawfully and without consent" and provided that a restraint is "without consent" if "it is accomplished by force, threat, or deception."  Jackson claims that the jury instruction for kidnapping did not adequately define the term "deception."

The trial court's original definition for the term "deception" read, in relevant part, "[d]eception means to knowingly promise performance that the defendant does not intend to perform or knows will not be performed."  This language borrows verbatim from the statutory definition of deception provided in AS 11.81.-900(b)(14)(E).  Jackson opposed this instruction at trial, arguing that it would allow the conviction of a person for kidnapping for simply picking up a prostitute, having sex with her, and then refusing to pay.

-11-

In response to Jackson's argument, Judge Souter modified the instruction by adding the words "at the time the promise is made." Thus, the given instruction stated:

"Deception" means to knowingly:

create or confirm another's false impression that the defendant does not believe to be true, including false impressions as to law or value and false impressions as to intention or other state of mind;

fail to correct another's false impression that the defendant previously has created or confirmed;

prevent another from acquiring information pertinent to the disposition of the property or service involved; or

promise performance that at the time the promise is made the defendant does not intend to perform or knows will not be performed.

The language in the instruction mirrors that of AS 11.81.900(b)(14) except for the language added by the trial court. Even after the change, Jackson continued to complain that the instruction did not satisfy his objection.

The instructions on kidnapping adequately set out the Alaska Statutes and clearly required the jury to find that Jackson and Osborne restrained K.G. "with intent to inflict physical injury or sexually assault" her. Jackson's complaint that the jury could have convicted him for having sex with a prostitute and then refusing to pay her has no merit. Under the definition of kidnapping the jury could not have convicted Jackson unless it concluded he restrained K.G. with the specific intent to sexually assault or injure her. The instructions which Judge Souter gave

set out the requirements for establishing kidnapping by deception. We find no error.

Jackson next contends that Judge Souter erred in denying his motions for judgment of acquittal and for a new trial. Following the jury's verdict, Jackson filed a motion for a judgment of acquittal or, in the alternative, for a new trial. In support of his motion, Jackson cited newspaper articles which purported to quote a juror describing jury deliberations. Jackson argued that these newspaper articles supported his contention that the jury misunderstood and misapplied the court's instructions. Jackson's attempt to impeach the verdict was totally at odds with Evidence Rule 606(b), which provides as follows:

> (b)  *Inquiry Into Validity of Verdict or Indictment*. Upon an inquiry into the validity of a verdict or indictment, a juror may not be questioned as to any matter or statement occurring during the course of the jury's deliberations or to the effect of any matter or statement upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

We conclude that Judge Souter did not err in refusing to consider Jackson's claim that the jury misunderstood the instructions.

Jackson also contends that Judge Souter erred in failing to instruct the jury on the misdemeanor offense of theft of services.  AS 11.46.200(a).  However, Jackson concedes that he

-13-

3330

never proposed such an instruction.  Since Jackson did not object,
he must show plain error.  Criminal Rule 30(a) and 47(b).  Jackson
has not shown plain error.

Jackson argues that there was insufficient evidence at
trial to convict him of kidnapping and sexual assault. In
determining whether there is sufficient evidence to support a
verdict, a court asks whether a reasonable jury, viewing the
evidence in the light most favorable to the state, could conclude
that the accused's guilt was proven beyond a reasonable doubt.
Hansen v. State, 845 P.2d 449, 451 (Alaska App. 1993).  A
reasonable jury could have concluded that Jackson kidnapped and
sexually assaulted K.G.

Jackson next contends that there was insufficient
evidence to convict him of the crime of first-degree assault. He
argues that there was insufficient evidence of the "serious
physical injury" required for a conviction under AS
11.41.200(a)(1).

Alaska Statute 11.81.900(51) defines "serious physical
injury" as:

> (A)  physical injury caused by an act
> performed under circumstances that create a
> substantial risk of death; or
>
> (B)  physical injury that causes serious
> and protracted disfigurement, protracted
> impairment of health, protracted loss or
> impairment of the function of a body member or
> organ, or that unlawfully terminates a
> pregnancy.

At trial, K.G. testified that she suffered pain for four
to six weeks after the assault, and that some of her injuries
continued to ache at the time of trial.  K.G. also claimed to

-14-                                              3330

suffer hearing problems, including blood discharges from one ear for several months after the assault occurred. In addition, there was substantial evidence from which the jury could have concluded that K.G. could easily have died from the effects of the assault and being buried in the snow. Viewed in the light most favorable to the state, reasonable jurors could conclude that K.G. suffered serious physical injury as a result of the assault.

Osborne raises several arguments that the evidence was insufficient to support his conviction. Osborne first contends that the evidence was insufficient to show that K.G. was restrained sufficiently to support the kidnapping charge. This argument is identical to the argument previously raised by Jackson. However, the evidence in this case was sufficient to support the finding that Osborne and Jackson committed kidnapping by deception: that they lured K.G. into Jackson's car by falsely promising that they would pay her for sex, intending to take her to an isolated area where they could sexually assault her. Once they removed K.G. to that isolated area, they sexually assaulted K.G. by forcing her to submit to them by use of a firearm. These facts support Osborne's conviction on the kidnapping charge.

Osborne next contends that, according to the facts in the case, there was insufficient time for him to have committed the crime. Osborne presents evidence of the time frame in which the kidnapping, rape, and physical assault occurred, and argues that he could not possibly have been involved in the offenses since "[t]he evidence leaves less than 15 to 20 minutes to commit all of the alleged acts."

3330

Despite Osborne's painstaking reconstruction of the temporal evidence presented at trial, the evidence was sufficient to show that the acts occurred. When the facts adduced at trial are viewed in the light most favorable to the state and K.G.'s testimony is credited, a jury could reasonably believe K.G.'s testimony that the assault occurred and conclude beyond a reasonable doubt that Osborne was present during the assault despite inconsistencies and uncertainties in the witnesses' estimations of time.

Osborne also contends that the state presented insufficient evidence at trial to support K.G.'s identification of him as one of the people who kidnapped her. However, when we review the evidence in the light most favorable to the state, it is apparent that a reasonable jury could have concluded that there was sufficient evidence to prove beyond a reasonable doubt that Osborne kidnapped, sexually assaulted, and assaulted K.G.

Jackson and Osborne both appeal their sentences. Judge Souter sentenced Jackson, a twenty-four-year-old first felony offender, to a composite sentence of twenty-seven years with five years suspended. He sentenced Osborne, a twenty-one-year-old first felony offender, to a composite sentence of twenty-six years with five years suspended. In sentencing Jackson and Osborne, Judge Souter considered the fact Jackson and Osborne had apparently led exemplary lives prior to this offense and that their rehabilitation was entitled to serious consideration in sentencing. However, he concluded that, in spite of this excellent prior record, he needed to impose a severe sentence because of the seriousness of the

-16-

offense.  He observed that it was surprising that the jury had found the defendants not guilty of attempted murder, and found that the evidence was very clear that they had fired a shot which grazed K.G.'s head and that they had left her for dead.  He found that it was "nearly miraculous" that K.G. survived the attack.  He observed that she easily could have been killed by the bullet or that she could have been knocked out long enough to die of exposure.

Jackson contends that Judge Souter erred in finding the aggravating factor that during his commission of assault in the first degree his conduct "manifested deliberate cruelty to another person."  AS 12.55.155(c)(2).  Jackson's conviction for assault in the first degree was based on his actions in beating K.G. repeatedly with the axe handle.  In finding this aggravating factor, Judge Souter found that Jackson had hit K.G. repeatedly with the axe handle and that he had left her for dead in the snow. Judge Souter's finding is supported by the record and supports his finding of the aggravating factor.  See Jones v. State, 765 P.2d 107, 109 (Alaska App. 1988)(setting out requirements to establish the deliberate cruelty aggravator).

Jackson also argues that Judge Souter erred in rejecting a proposed mitigating factor: that "the conduct constituting the offense was among the least serious conduct included in the definition of the offense."  AS 12.55.155(d)(9).  In rejecting this mitigating factor, Judge Souter found that the offense was far from the least serious.  This finding is supported by the record and support Judge Souter's findings rejecting the proposed mitigating factor.

-17-

3330

Jackson and Osborne argue that their sentences are excessive. In <u>Williams v. State</u>, 800 P.2d 955 (Alaska App. 1990), <u>on reconsideration</u>, 809 P.2d 931 (Alaska App. 1991), we analyzed prior sentencing decisions for first felony offenders who were convicted of both kidnapping and sexual assault. We summarized those decisions as follows:

> These decisions indicate that an aggregate term of twenty years or less will normally be appropriate for a first felony offender in a kidnap/rape case; a longer sentence will be warranted only when the kidnapping is aggravated in its own right, either because of its duration or because the defendant actually placed the victim's life in jeopardy by means of the abduction.

<u>Id.</u> at 959 (footnote omitted). In a footnote, we went on to point out that "it is also conceivable that a composite term of more than twenty years might be justified in a first offense kidnap/rape case if the circumstances surrounding the victim's sexual assault were exceptionally serious." <u>Id.</u> at 959 n.4. Judge Souter properly found that Osborne and Jackson's kidnap/rape case was substantially aggravated by their conduct during the crime. In particular, Jackson and Osborne severely beat K.G., shot her, and left her for dead. These findings clearly justified the sentence which Judge Souter imposed. We conclude that the sentence was not clearly mistaken.

The convictions and sentences are AFFIRMED.

3330