William Osborne
Discretionary Parole Hearing
August 11, 2004

WO = William Osborne
DC = David Cooper
LS = Linda Smith

---

[...]at Spring Creek Correctional Center to hold a discretionary parole hearing in the matter of William Osborne. Present on behalf of the board and conducting the hearing is Chairman David Cooper. Board members also present are Charles Moses and Linda Smith. Board staff present is Ken Sprower and Larry Jones. Mr. um, Osborne is present with his institutional parole office Oscar Prim. Mr. Cooper?

Mr. Cooper, if I could just add for the record so that where the board has been handed out today a letter from the victim and I have an email from the Office of Victim Rights, Steven Branchflower, uh, that he has faxed that letter from the victim here and we'll let him know that we received it but he and he wants to know the board's decision, but he wanted to mention to the board that she chooses not to appear at the hearing because it would make her very emotional. Thank you.

The only question I have Mr. Cooper, is did Mr. Osborne get the letter a copy of the same letter?

Yes, I inquired at the beginning here and he did.

Mr. Osborne, the parole board members didn't receive the letter. I'm advising you that the board members have read the parole progress report, same report that you have, in preparation for the hearing today. Have you read the entire report?

WO: Yes, I have.

When you read the report Mr. Osborne, did you find any statements to be outright errors?

WO: Um, just little small technical errors like my age and uh and errors that were made that made in my presentence report, stuff like that. Nothing, uh, nothing that

We're not dealing with presentence reports.

That's a court official document (indiscernible)

With regards to his age, Mr. Cooper.... you're not 42, Mr. Osborne?

WO: No sir, I'm 32.

You're thirty-two?

WO: Yes, sir.

Thirty-two. Okay Mr. Osborne.

WO: Yes, sir.

Mr. Osborne, parole is a serious matter. For the memb..., for the board members as well as you ... and uh, today we'd like to hear from you. Based on information that has been provided to us in the official record, institutional record and update, we would like to hear your basis for requesting discretionary parole. Why should the Alaska Board of Parole grant Mr. Osborne a discretionary parole?

WO: Um, I believe I should be um granted discretionary parole because I'm at a point in my incarceration where I basically accomplished everything I came here, I can't, I mean, uh, over the, I've been incarcerated for the last eleven years and I've participated in programs from anger management to cognitive skills to uh, substance abuse programs I didn't even, I was ... there was no basis for me to participate in. Like, for example, substance abuse. I don't have a substance abuse problem. But I participated in the program because I felt I could learn something from the program. So, I believe I should be, uh, should be granted parole because I can't grow any more here. I can't change or become any better. And by being placed on discretionary parole it would give me a opportunity to challenge myself in new and different ways, to put myself in positive environments instead of being stuck here in a negative one.

Mr. Osborne, what is different, specifically different, about you today as opposed to the time when these offenses occurred?

WO: There's lotsa things that's different about me.

OK, list them.

WO: Uh, well, for one, I have more self-confidence. I'm not a, initially, when I was at this age, when I was 20, I had a lot of self-esteem problems, lot of confidence problems. Um, even when I was doing good things, like, I was in the military and I had a lot of family, lot of friends, lot of support, I still didn't have confidence and belief in myself. I do now. Um, my outlook on life is different. Before, I didn't have a, uh, really a direction I could see myself going in as far as the things I wanted to do, the things I wanted to accomplish in life. Now I have a goal. Now I have a focus. Um, and I see things differently, just from the way I used to. Like before, one of, well, one of the biggest things I've learned since I've been incarcerated is that there's no such thing as a lesser evil. Some people believe that it's ok to uh, that it's less of a crime to say, push somebody over than to kick someone. And one of the things I've learned is that that's not true. Irregardless of what the wrong is, a wrong is a wrong. And that's something I couldn't really see before when I was younger, when I was 20 but now that I'm 32 I've been here and I've been able to see everything from ugly to ugliest. I can understand that there is, there is a difference or that there is no difference between right, I mean, you know, lessers or evils, and things, a wrong is a wrong. Just because, just because, uh, just cause I pushed someone or, or, or I try to justify my actions saying that it doesn't effect that person, it does, regardless of what it is, regardless of what my action is. And that is something I couldn't see when I was younger. That my actions do effect people.

Do you, during this period of incarceration do you recall any type of or some specific reason the change came about?

WO: Yes, sir.

Significant changes, can you recall?

WO: Yes, sir. Um

What was it, what happened?

WO: Basically I spent a lot of time in segregation. I got ah; I was transferred from here in 1994, down to uh 1995 down to Arizona and I did about two years there out of general population. Then I ended up being segged .. and it became a long-term seg to the point where I ended up doing six years maximum security in the hole. In that time you get a lot of time to think, you're locked in a cell 23 hours a day. You only get a hour for recreation and I just had time to really stop and think about you

know my actions and my behavior and just take a good look at myself. Basically my epiphany came when I was in the hole, when I was in segregation.

Mr. Osborne when we speak of discretionary parole, tell us what your definition, what is parole?

WO: Well, parole or discretionary parole is basically a privilege. It's opportunity for an inmate to have, is a basically opportunity for an inmate leave prison and go back out in to society.

Do you have any thoughts about, why many inmates fail on parole, what do you think about that?

WO: Simply because they don't put enough effort into it, they refuse to follow the rules and guide lines that are stipulated. A lot of them, I learned something from a guy who told me he said what you're doing here is what you're going to do out there. So a lot of the guys here don't put forth any effort what so ever to better themselves. For example, they might come in without a GED. The facilities is here, it's offered here to get a GED but the education barely has 20, 30 inmates at a time signed up for a GED or whatnot, and it's just lack of effort, I would assume.

Mr. Osborne, you gained 10 years today by the correction of your age from being 42 to now, I know you're 32, so that's one thing that happen. I read in the file about in the early times, and I'm going to take you back to your case, when they tried your case and you were found guilty and you read your victim's letter today and her feelings about today about what happen to her. But I read in the early days, Mr. Prim that Mr. Osborne's mother had said to the pre-sentence writer that she did not believe that her son had did the crime for which he was charged for or accused of and that she did not want to see you railroaded. I know today you want to go or that you ask to go interstate parole to Georgia.

WO: South Carolina.

South Carolina, I don't know why I get these Midwest states, southern states mixed up. But any way clearly South Carolina because that's where your mother lives.

WO: Yes, sir.

When I read that at home Mr. Osborne I asked myself having read the pre-sentence report, I wonder to this day, does Mr. Osborne mother still believe that her son did not commit this crime? And wondering that, I

said I was going to ask you today, have you told your mother the truth about your involvement in this crime?

WO: Yes, sir, I have.

And when did you tell her that?

WO: Came basically a couple months after I had been incarcerated, initially when I was first charged with my crime. Basically the crime of rape I was very embarrassed and I come basically from a family of women, I mean, at home right now it's my mother, my three sisters, and mostly my female cousins. All my family is back in South Carolina. So, I couldn't really, I didn't want to disappoint my mother by telling her I had done something like this, and initially it's not that I lied to her, but I just didn't give her all of the facts. I led her on to believe that I hadn't committed a crime and a few months after that I told her the truth.

So I heard everything you said, so as I sit here today I do know that now your mother understands that you did commit the crime of which you were charged?

WO: Yes, sir.

I'm glad that you told your mother the truth about that Mr. Osborne because it's important, that good people know that the criminal justice system doesn't always railroad people. In particular, her son a black man. And that bothered me and I said when I see Mr. Osborne for the first time in my life I was going to ask him did he tell his mother the truth? That she knows that, yes, in fact her son for what ever reason Mr. Osborne did commit this vicious crime and she needs that belief as a mother. Because there is a lot of mothers Mr. Osborne who go to their graves, knowing their sons are completely guilty and defending them every day of their life.

WO: Yes, sir.

And I did not want your mother to have to go through that.

WO: I'm my mother's only son, so I mean she's basically tried to protect me all me all her life.

I can appreciate that. Mothers do that. Let me ask you, I read your lawyer's letter. Does your lawyer know that you've admitted to the crime and is appealing of the crime still?

WO: Yes, sir. When I received my parole packet from Mr. Prim, I told my lawyer the statement that I had prepared which is the very first question of the ah.

Your version of the crime?

WO: Yes, sir. And I told him that.

And it's your right, I'm not questioning your right to appeal but that's the other question I wanted to ask cause I would not want you, you can do anything you want to. That's between you and your attorney. But I was just wondering this attorney written this letter for the Parole Board, does he know that his client has admitted his guilt of this crime?

WO: Yes, sir.

So now I have two answers to questions: the question about you telling your mother and the question about your lawyer. Having said all of that and I appreciate your responses to the questions on this record. Twelve years later, let me ask you this first, I would hope that the military services made a disposition as to your status. Have you received a discharge?

WO: Yes, sir. I was given an Other Than Honorable Discharge that came approximately a month or two after I was convicted.

A month or two after you were convicted?

WO: Yes, sir

The military sounds like they treated you favorably. They did not give you a bad conduct discharge which will disallow you for any benefits of the military. They gave you an Other Than Honorable Discharge?

WO: Yes, sir.

That was a fair disposition, in my opinion.

WO: Yes, it was.

How do you account for yourself being involved in the crime that you've been convicted of? How do you account for yourself being in that?

WO: Well, like I said, um when I was speaking to the gentlemen here. Even though I had a lot of good things going in my life I didn't have confidence in myself to believe in myself. One of the problems I had to

deal with was, always wanting to do what my friends did to try to please them and make them happy. I wanted to be excepted by them, so I had a tendency even before I came here, I mean before I got involved in this incident. I had a tendency to always try to do whatever my friends were doing because I felt like if I didn't do what they were doing I would be the outsider. And, what ended up happening was one night, Mr. Jackson and another guy approached me, and they asked me if I wanted to go out with them, and basically go out and do something stupid, and I agreed to that and I agreed to that because I didn't want to be looked upon as too weak or the outsider.

Having heard that let me stop you for a second, are you saying that there was a third party other than the victim at the time of the crime?

WO: Initially there was a third party which was this guy name Jonathan Edwards, but before this incident happened he ended up transferring and going back home to North Carolina. He was discharged from the military.

I understand that. Let me go back. On the night of the crime, prior to the crime occurring were there three of you perpetrators involved with the one victim?

WO: No, sir. Just me and my co-defendant, Mr. Jackson.

Okay, I just want to be clear there, because it sounded like...

WO: No. I'm just saying that was the incident that led up to it.

I understand. There was three of you in the beginning but prior to the act occurring, one person dropped out gone some place else.

WO: Yes, sir.

Okay, you're aware that Mr. Jackson fingered you? You're aware of that right?

WO: Yes, sir.

Where is he today, to the best of your knowledge?

WO: I believe he is in Central Arizona Detention Center in Arizona

Have you ever been to Arizona in the same time he was there?

WO: I was with him here prior to Arizona because we both were transferred here in like June, July of 1995. Then we were both ended up in Arizona. Yes, sir. I was there for four years.

I read in the early part of your file about the time that Investigator Branchflower found out that the two of you were writing in the Cook Inlet Pretrial Facility and asked for a warrant to intercept that correspondence. I did not know the two of you had contact from that point on to current.

WO: Yes, sir. We ... in our institutional files we have a separate but they keep putting us in the same place.

But they keep putting you in the same place.

WO: Still been in the same facility.

Mr. Prim, you might note that. But at any rate, all of that being said, what is the relationship between you and Mr. Jackson, is there animosity, hostility, or is there still camaraderie that occurred at the time or prior to this crime?

WO: I have no relationship with my co-defendant. Uh, part of the reason that only his letter was seized when he wrote the letter at Cook Inlet is because I never responded, I never wrote him back. And since that day, I don't have any animosity towards to him. I mean he does his thing and I do my thing but I don't consider him a friend anymore like I used to.

I'm going to leave it there and I appreciate the response. I have nothing further at this time.

Ms. Smith

LS: Thank you, um Mr. Osborne did you read the victim's letter?

WO: Yes Ma'am, I did.

LS: What's your reaction?

WO: I expected that. I expected her response due to the simple fact that uh, when we went to trial and she was given the opportunity to make her statement and she made her statement. Her statement was almost something similar to uh this right here as far as the animosity and her feelings about the incident. So, I expected her to basically say the same.

LS: Yours is a very brutal crime. Brutal. Beside the fact you raped her, hit her in the head with a gun, you shot her. Then covered her up with snow with the hope she wouldn't be found. I mean that's truly brutal.

WO: Yes, ma'am. But the incident ... I understand how the incident was written and how it was played out in court. The incident didn't exactly play out like that. We didn't, nobody tried to kill [the victim]... I mean the reality is, if we had wanted to kill her we could have. We were out in the middle of nowhere, there, it was dark, there was nobody around, you know it was outside of the city limits. So if we really wanted [ her ] to be dead she would have been. She claims she was shot in the head and that's how she got the scar that was on her head and that scar came from the fact that when she was in the car and it was after me and my co-defendant had had sex with her, she was in the car, she was nude and my co-defendant, I had stepped out of the car and my co-defendant had asked her to get out of the car and she wouldn't get of the car. Her reason for not getting out of the car was because she was scared. She thought y'know, that now the sex is over we are going to get her out of the car and kill her. And I can understand her reason and that but the reason we asked her to get out of the car is because we want to go, we didn't want to try and give her a ride back into the city, that wouldn't have made y'know, that would have... made no sense. But he had asked her to get out of the car and she refused to get out of the car, he asked her like two or three times and when she refused like the third time he hit her in the head with the gun and the gouge that she had on her head came from the butt of the weapon, the butt of the handgun. And that's how she got the mark on her head. She said ... [interruption] I'm sorry...

***********