IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| WILLIAM G. OSBORNE, | ) |
|                 Petitioner, | ) |
| vs. | ) |
| STATE OF ALASKA, | ) |
|                 Respondent. | ) |
| | ) Case No. 3AN-97-006336 CI |

RECEIVED
MAY 0 8 2006
Office of the District Attorney
Third Judicial District
Anchorage, Alaska

## FINDINGS ON REMAND

This case is before this court on remand from the Court of Appeals. <u>Osborne v. State</u>, 110 P.3d 986 (Alaska App. 2005). Specifically, this court is to determine whether Mr. Osborne has a due process right pursuant to the Alaska Constitution to have more discriminating DNA testing performed on physical evidence from the crime scene.[1] Mr. Osborne has asserted that additional testing could demonstrate that he was factually innocent of the crimes for which he was convicted.

The Court of Appeals has remanded this case to the trial court to determine whether Mr. Osborne can meet a three-part test that it articulated in its decision. Pursuant to the Court of Appeals decision, in order to obtain post-conviction DNA testing, Mr. Osborne must show, at a minimum, "(1) that the conviction rested primarily on eyewitness identification evidence, (2) that there was a demonstrable doubt

---

[1] In its decision, the Court of Appeals stated that "it appears .. that Osborne has no due process right under the federal constitution to present new evidence to establish his factual innocence." However, Mr. Osborne has a case presently pending before the United States District Court with respect to that issue. See <u>Osborne v. District Attorney's Office</u>, 423 F. 3d 1050 (9th Cir. 2005).

Exh. A

concerning the defendant's identification as the perpetrator, and (3) that scientific testing would likely be conclusive on this issue." Osborne v. State, 110 P. 3d at 995. If this court finds that Mr. Osborne meets this test, then the Court of Appeals specified additional legal determinations that this court is to make.

This court has now reviewed the extensive briefing of the parties with respect to these three points, together with the trial transcript. Based on that review, this court finds as follows:

### 1. *Did the conviction rest primarily on eyewitness identification evidence?*

At trial, K.G. identified Mr. Osborne as one of the perpetrators of the crime. She had also identified him in a line-up. Her trial testimony was that she had no doubt that Mr. Osborne was the passenger in the vehicle at the time of the crime. (Tr. 446).

As noted by the State, in the prosecutor's closing argument, she first argued that the testimony of K.G., the victim, alone was sufficient to convict. But then she asked the jury "to join me in an exercise of caution in which we assume K.G. never came in here, she never testified, and you never heard from her, and I will show you that the evidence in this case warrants a conviction of Osborne... even if you never met K.G." (Tr. 1898).

As the prosecutor then demonstrated, there was substantial physical evidence to place Mr. Osborne's co-defendant, Dexter Jackson, at the scene of the crime. A non-exclusive list of the physical evidence at trial against Mr. Jackson included the following evidence: (1) imprints of tires matching Mr. Jackson's car were found at the scene of the crime (Tr. 142-3); (2) the victim's readily identifiable pocketknife was found on Mr. Jackson's person when he was arrested (Tr. 703-707, 714-19, 733-36), (3) a fiber similar to the carpeting of Mr. Jackson's car was found on the victim's sweater (Tr. 872-

78, 884), (4) a bottle of perfume that the victim had with her at the time of the crime was found in Mr. Jackson's car (Tr. 442-43), (5) blood found in Mr. Jackson's car was tested and matched the victim's DNA (Tr. 1507-1510), (6) an expended round was found at the scene that was later determined to have come from Mr. Jackson's gun (Tr. 1533, 1546-7), and (7) that same gun was located in the glove box of Mr. Jackson's vehicle when he was arrested by military police. (Tr. 703-707, 714-19, 733-36).

Although there was less evidence to place Mr. Osborne at the scene of the crime, the following evidence, in addition to K.G.'s identification of Mr. Osborne, was presented at trial:

- Mr. Osborne called Mr. Jackson twice from the Space Station earlier in the evening of the crime. (Tr. 1275-6, 1288).

- Mr. Osborne was seen entering a vehicle driven by Mr. Jackson near the Space Station at approximately 9:30 p.m. on the evening of the crime. (Tr. 1219, 1284).

- Mr. Osborne was seen later that same evening with Mr. Jackson, and some of the witnesses who saw Mr. Osborne at that time noticed blood on his clothing. (Tr. 1088, 1113, 1177).

- K.G. told the woman who picked her up immediately after the incident that the assailants were "two black guys with military kind of haircuts," which was consistent with Mr. Osborne's physical characteristics. (Tr. 91).

- A tool handle was found in Mr. Osborne's room, similar to the tool handle that was found at the crime scene which K.G. described was used to hit her. (Tr. 1293).

- Space Station tickets were found in Mr. Jackson's vehicle. (Tr. 1288).

There was also some scientific evidence that was presented to the jury. A state criminalist testified that a pubic hair found on K.G.'s sweater was dissimilar to Mr.

Jackson's hair, but that it could have come from Mr. Osborne. But in cross-examination, this witness acknowledged that the similarity "could be a coincidence." (Tr. 888.) The scientific testing of hair at that time was evidently limited to microscopic examination, not DNA testing. Another hair found on K.G.'s sweater was dissimilar to both Mr. Osborne and Mr. Jackson. (Tr. 1113). There was also a condom wrapper found at the crime scene near the shell casing. (Tr. 916). K.G. testified that the condom wrapper was exactly like the kind of condom that she had with her that evening. (Tr. 442). She also testified that the passenger in the car took her condom and put it on before he had sex with her at the crime scene. (Tr. 526).

A used condom was found at the scene of the crime. (Tr. 915). A crime lab worker tested its contents, and determined that the DQ alpha type of the sperm in the condom was similar to that of Mr. Osborne, but not Mr. Jackson. The state's expert testified that between 14.7 and 16 percent of the African American population would have this same genotype. (Tr. 1504). She indicated that she considered sending out the sample for more discriminating testing, which was then available through the FBI. However, at least at that time, more discriminating testing required a better quality sample than was provided in the condom. (Tr. 1515). As a result, she did not recommend that the sperm from the condom be sent to the FBI for more discriminating tests "because I felt that the sample was degraded." (Id.). A pubic hair on the condom was found to be similar to Mr. Osborne's hair, but, like the other hair, the criminalist testified that the hair, while similar, was not necessarily from Mr. Osborne. (Tr. 883).

Upon consideration of all of this evidence, the court finds that Mr. Osborne has failed to make the requisite showing that his "conviction rested primarily on eyewitness identification evidence." Although the actual basis for the jury's determination is unknown, the State presented considerably more evidence at trial in addition to K.G.'s identification of Mr. Osborne in support of his conviction. Two separate groups of individuals placed Mr. Osborne with Mr. Jackson on the night of the crimes. The first group had Mr. Osborne getting into Mr. Jackson's vehicle in the area of Spenard where K.G. was picked up. Videotape and phone records from the Space Station supported Mr. Osborne's presence there. A second group of individuals saw Mr. Jackson and Mr. Osborne together later that same night after the crimes were to have been committed. Some of these individuals reported that Mr. Osborne had blood on him.

It is also significant that the prosecution framed its closing argument precisely around the breadth of the evidence in this case. Having gone over K.G.'s account of the crime, the prosecution then invited the jury to factor out K.G.'s identification of Osborne and evaluate the other evidence independently. Thus, while K.G.'s testimony was highly incriminating for Osborne, the jury was explicitly counseled that it was not obliged to rely primarily on that testimony. In sum, this court finds that Mr. Osborne's conviction did not rest primarily upon eyewitness identification evidence.

### 2. *Was there a demonstrable doubt concerning the defendant's identification as the perpetrator?*

At trial, Mr. Osborne's primary defense was that he had been misidentified. And there were some problems with K.G.'s identification that were presented to the jury.

The evidence established that K.G.'s uncorrected vision was somewhere between 20/300 and 20/400, and that she was not wearing glasses on the evening of the crime. (Tr. 1725). K.G. had identified the passenger as without any facial hair, while Mr. Osborne had a mustache. (Tr. 273). And K.G. had identified the passenger as weighing 180 to 190 pounds and between 25 to 30 years old, while Mr. Osborne was 20 years old and weighed 155 pounds. (Tr. 1408). Mr. Osborne also argues that eyewitness identifications are generally suspect, especially when a person of one race is asked to identify a person from another race.

K.G. testified at trial that she had no doubt that Mr. Osborne was the passenger in the vehicle: "When someone tries to kill you, when they come that close, you will not forget their face." (Tr. 446). If K.G.'s identification of Mr. Osborne were to be considered in isolation, without consideration of all of the other evidence that the state presented to support Mr. Osborne's conviction, then there would be demonstrable doubt concerning Mr. Osborne's identification as the perpetrator. But, as this court has found above, Mr. Osborne's conviction did not rest primarily upon K.G.'s identification of him. And when K.G.'s identification of Mr. Osborne is considered in conjunction with all of the other evidence submitted by the State at the trial, no such demonstrable doubt as to Mr. Osborne's identification has been established.

### 3. Would scientific testing likely be conclusive on this issue?

Mr. Osborne asserts that if the biological evidence in this case could be retested, it could conclusively establish that Mr. Osborne did not commit the crimes. One possibility of such testing is that the semen, which the criminalist found compromised

and degraded in 1993, is still not of a quality to produce any definitive result, even with improved testing procedures. See Pet. Brief on Remand at 11.[2] Obviously, such scientific testing would not be conclusive at all in this circumstance.[3]

It is also possible that the scientific testing would definitively establish that the sperm in the condom was from Mr. Osborne. This would be conclusive as to his presence at the crime scene.

Or it is possible that the semen sample is too degraded to be tested, but the hair that was found on either the sweater or the condom could be tested. If the hair on the condom was identified as from Mr. Osborne, that would be conclusive as to his presence at the crime scene.

Another possibility, and the one which Mr. Osborne is hoping to establish, is that the testing would definitively establish that the DNA in the semen or the hairs did not belong to Mr. Osborne. In this court's view, even if testing results as to the hair on the sweater demonstrated that the hair did not belong to Mr. Osborne, it would not be conclusive, particularly given K.G.'s work as a prostitute.

As to the pubic hair on the condom or the semen, a finding that these were not from Mr. Osborne presents a much closer question as to conclusiveness, particularly given K.G.'s testimony at trial about the condom. However, as the State notes, the condom and hair were not found at the crime scene until over 24 hours after the assault. (Tr. 106). Even assuming that the DNA of either the pubic hair or the semen was tested

---

[2] There, Mr. Osborne asserts, "Even if the fluid from the condom is degraded, Osborne can now have the hair found tested to show he was not the source of the pubic hair on either the sweater or the condom."
[3] By order dated August 20, 2002, this court ordered that the State cannot destroy any evidence in this case without court order.

and found not be Mr. Osborne's, the State asserts that it would not explain away or defeat the considerable other remaining evidence that was introduced at trial which underlay the basis of the jury's conviction. Mr. Osborne argues that the State, in making this argument, is impermissibly changing its position by arguing that the State's own evidence that it presented at trial may be unreliable and that the State should not be permitted to disavow this evidence on which the conviction was based. But the State has not argued that the DNA evidence would not support a conviction; it has instead argued that it did not and need not rely exclusively on that evidence. Given the extensive other evidence which linked Mr. Osborne to these crimes as summarized above, this court agrees with the State that such evidence, if obtained, would not be conclusively exculpatory. Cf. Sewell v. State, 592 N.E. 2d 705 (Ind. 1992); Jenner v. Dooley, 590 N.W. 2d 463 (S. Dak. 1999).

Finally, while the first two inquiries under the three-part test that the Court of Appeals has adopted are retrospective in nature, inquiry into the conclusiveness of any testing would appear to be prospective. It is thus relevant to this court that, in 2004, Mr. Osborne admitted in detail to committing this crime in an Application for Discretionary Parole. Fayette Aff. (Sept. 6, 2005), Ex 1. In that application, dated April 8, 2004, Mr. Osborne clearly acknowledged that he had sexually and physically assaulted K.G. Directly above his signature on the application is an acknowledgement that he "must state the exact and complete truth in this written application as well as at my parole hearing." Id.[4]

---

[4] Mr. Osborne recently submitted an affidavit with this court in January 2006. There, he stated that, "It is common knowledge that if an inmate does not make a confession to the crime he's convicted of, the

For the foregoing reasons, this court finds that scientific testing is not likely to be conclusive on the issue of Mr. Osborne's identification as one of the perpetrators of this crime.

### Conclusion

Based on the above analysis, this court finds that Mr. Osborne has failed to meet any component of the three-part test set forth by the Court of Appeals. Accordingly, this court does not reach the additional legal questions that were conditionally posed to this court by the Court of Appeals in its decision.

DATED this 8th day of May, 2006.

*Sharon Gleason*
SHARON GLEASON
Judge of the Superior Court

I certify that on 5-8-06
a copy of the above was mailed to each of
the following at their addresses of record:    Cavanaugh
_____                         Fayette
Administrative Assistant                        appeals crt.

parole board more than likely will not grant him discretionary parole." Nowhere in the recent affidavit does he indicate that his detailed admission to the crime that he made to the parole board in 2004 was false.

Osborne v. State, 3AN-97-00636 CI
*Findings on Remand*
Page 9 of 9

Exh. A